United States District Court
Southern District of Texas
**ENTERED**
July 14, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IRIS XIMENA PALOMO DIAZ AND JESUS ULISES PALOMO DIAZ,

Plaintiffs,

VS. — CIVIL ACTION NO. 1:21-CV-151

ANTONY BLINKEN, U.S. SECRETARY OF STATE AND THE UNITED STATES OF AMERICA,

Defendants.

**ORDER AND OPINION**

Siblings Iris Ximena Palomo Diaz and Jesus Ulises Palomo Diaz filed this action under 8 U.S.C. § 1503(a) against Antony Blinken, United States Secretary of State, seeking a declaratory judgment that they are United States citizens. Iris and Jesus were born in Mexico to Ana Julia Diaz Martinez and Jose de Jesus Palomo. Plaintiffs' mother was born in Mexico, but she acquired United States citizenship at birth through her father (Plaintiffs' grandfather). Whether Plaintiffs acquired citizenship at birth through their mother depends on whether she was physically present in the United States for the requisite number of years prior to their respective births.

In May 2023, the Court held a bench trial. Based on the record and the applicable law, the Court concludes that Plaintiffs Iris Ximena Palomo Diaz and Jesus Ulises Palomo Diaz have each demonstrated by a preponderance of the evidence that they satisfy the statutory requirements to have acquired United States citizenship at birth.

## I. Findings of Fact

At trial, the Court heard testimony from Jose de Jesus Palomo (Plaintiffs' father), Ana Julia Diaz (Plaintiffs' mother), Esmeralda Diaz (Plaintiffs' aunt), Juan Alejandro Roman (Plaintiffs' great-uncle), Constancio Diaz Roman (Plaintiffs' great-uncle), and Yolanda Cuellar

Cantu (Plaintiffs' mother's friend).[1] Based on their testimony, the admitted exhibits, and the parties' stipulated facts, the Court reaches the following findings of fact.

On January 24, 1971, Ana Julia Diaz was born in San Fernando, Tamaulipas, Mexico. (Ana's Birth Cert. (PX1-1), Doc. 36-1, 1) Growing up, Ana was told by family members that around the time of her birth, her parents lived together in Houston, Texas. For the birth, however, Ana's mother traveled to Mexico to be with her mother-in-law. In August 1971, Ana's parents registered her birth in Mexico. (*Id.*) The following year, Ana's mother gave birth to a son, also in San Fernando, Mexico.

Around 1973 or 1974, Ana's uncle, Constancio, moved in with her family in Houston. During this time, Ana's sister, Mayte Diaz, was born at a hospital in Houston, Texas. (Mayte's Birth Cert. (PX 4-1), Doc. 36-4, 1) Of the four siblings in the family, only Mayte was born in the United States. Mayte's birth occurred in Houston because at the time, Ana's maternal grandmother was visiting the family in Houston, so Ana's mother did not travel to Mexico to give birth, as she did with her other children.

As a young child, Ana lived in Houston for at least two and a half years. During that time, she went to school with her cousins, attending Eliot Elementary School, which was across the street from where her cousins and uncle lived. Ana and her uncle recall that when she lived in Houston, Ana and her extended family would visit each other's homes, shop together, and take trips to the beach in Galveston, Texas.

Ana also recalls that on occasion, her father would tell her mother he was taking their children to eat or to the park, but instead would take them to the apartment of another woman and her children. When Ana was 10 or 11 years old, her mother discovered that Ana's father was having an affair. Ana, her siblings, and her mother moved to Monterrey, Mexico, and then a couple of years later, to another Mexican city, Estación.[2] Around the time that Ana was 14, the

---

[1] Given the common surnames among many of the witnesses, the Court will refer to all witnesses by their first name.
[2] The record is unclear whether Ana's father moved with them.

family moved to San Fernando, Tamaulipas, a Mexican town about 100 miles from the Texas border. Ana recalls celebrating her fifteenth birthday (*quinceañera*) in San Fernando. It was also around this time that Ana's father was accused of a serious crime. He avoided arrest for a period, and occasionally visited his children. But when Ana was 16, the authorities arrested him and held him in custody for more than a year.

With her father incarcerated, Ana helped support the family by traveling to the United States to work as a live-in babysitter. For about two years, she remained in south Texas for three months at a time, visiting her mother's home in Mexico for a week before resuming another three-month period in the United States. Initially, she crossed into the United States using her sister, Mayte's birth certificate. After about a year, Mayte stopped allowing Ana to use the documents. Ana then acquired a visa to enter the United States.

Shortly before Ana turned 19, she tried to cross back into the United States, but a border official destroyed her visa documents and said that she could not work in the United States with them. As Mayte no longer allowed Ana use of her documents, Ana remained in Mexico and studied to be an executive secretary. She finished the program in about two years and began working as a secretary for a government employee in San Fernando. When she realized that she earned only a third of what she made as a babysitter in the United States, she applied for new documents to return to work in south Texas. In the early 1990s, she secured those documents.

From December 1994 to February 1996, Ana worked in Brownsville as a babysitter for a nurse's family. During this time, Ana stayed with the nurse's family during the week, and would spend Friday nights at the home of Yolanda, who was a family friend. Yolanda testified about introducing Ana to the nurse, and having Ana stay with her on Fridays. Ana would travel to Mexico on Saturday to visit her mother, returning to Yolanda's home on Sunday.

While working in Brownsville, Ana began dating Jose de Jesus Palomo, a Mexican citizen. He recalled picking Ana up in Brownsville on Fridays to drive her to Yolanda's house. By 1996, however, Jose had grown frustrated with Ana's living arrangements. He told Ana that he wanted

her to return to Mexico so they could marry. Ana agreed, and in the summer of 1996, the couple married in Mexico, moving in together in San Fernando. (Marriage Cert. (PX1-5), Doc. 36-1, 8) In July 1997, Ana gave birth in San Fernando to Plaintiff Iris Ximena Palomo Diaz. (Iris's Birth Cert. (PX 2-1), Doc. 36-2, 1) And about three years later, in September 2000, she gave birth in the same town to Plaintiff Jesus Ulises Palomo Diaz. (Jesus's Birth Cert. (PX 3-1), Doc. 36-3, 1)

In February 2017, Ana filed an action under 8 U.S.C. § 1503(a), seeking a declaratory judgment that she acquired United States citizenship through her father. *See Diaz-Martinez v. Tillerson*, No. 1:17-cv-039 (S.D. Tex. 2017). That case centered on her father's physical presence in the United States. In a deposition taken in that case, the government asked Ana about her life in Texas. Ana testified that as a child, she "lived for a while, like for a year or two in Houston. My father took me there." (Ana's Dep. (DX 4), Doc. 37, 9:3–5) When the government asked, "Other than the year or two when you lived in Houston, did you live for the rest of your life in Mexico up until 10 years ago?", Ana replied, "Yes." (*Id.* at 9:6–9) In that deposition, she did not mention her time working as a babysitter in the United States, or any other period living in Houston during her childhood. In April 2020, Ana prevailed in her lawsuit, obtaining a Final Judgment declaring her a United States citizen at birth. *Diaz-Martinez*, No. 1:17-cv-039, at Doc. 29.

In February 2021, Iris and Jesus each submitted an application to obtain a United States passport. (Passport Apps., Doc. 2-1, 15) In August, after Iris and Jesus submitted additional evidence, the Department of State denied their applications. (Iris's Denial Letter (PX 2-2), Doc. 36-2, 3; Jesus's Denial Letter (PX 3-2), Doc. 36-3, 3)

In October 2021, Plaintiffs filed this lawsuit.

## II. Conclusions of Law

Plaintiffs bring this declaratory judgment action under 8 U.S.C. § 1503(a), which provides a mechanism for an individual within the United States to challenge the denial of a right or privilege based on the determination of citizenship.

### A. Applicable Standard

Under Section 1503(a), "[t]he Court must make a *de novo* determination of whether a plaintiff is a United States citizen." *Garcia v. Clinton*, 915 F. Supp. 2d 831, 833 (S.D. Tex. 2012), *aff'd sub nom. Garcia v. Kerry*, 557 F. App'x 304 (5th Cir. 2014). "There are 'two sources of citizenship, and two only: birth and naturalization.'" *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 394 (5th Cir. 2006) (quoting *Miller v. Albright*, 523 U.S. 420, 423 (1998)). "Persons not born in the United States acquire citizenship by birth only as provided by Acts of Congress." *Thomas v. Lynch*, 796 F.3d 535, 538 (5th Cir. 2015) (quoting *Miller*, 523 U.S. at 424). Such acts of Congress include statutes that extend birthright citizenship to children born abroad when at least one parent is a United States citizen and certain statutory requirements are met. *Id.* "The applicable law for transmitting citizenship to a child born abroad when one parent is a citizen is the statute in effect at the time of the child's birth." *Iracheta v. Holder*, 730 F.3d 419, 423 (5th Cir. 2013).

In a Section 1503(a) case, the district court holds a bench trial and weighs the evidence, determines the credibility of witnesses, and resolves conflicting testimony. FED. R. CIV. P. 52(a)(1), (6); *United States v. Jennings*, 726 F.2d 189, 190 (5th Cir. 1984). A plaintiff "must prove citizenship by a preponderance of credible evidence." *Ayton v. Holder*, 686 F.3d 331, 335 (5th Cir. 2012); *see also* 22 C.F.R. § 51.40 ("The applicant has the burden of proving that he or she is a U.S. citizen . . . ."). Proving a fact by a preponderance of the evidence means showing that the existence of that fact "is more likely than not." *Matter of Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1164 (5th Cir. 1993).

As for testimony, courts weigh the credibility of witnesses, but receive a plaintiff's self-serving statements and those of interested witnesses "with a grain of salt." *De Vargas v. Brownell*, 251 F.2d 869, 871 (5th Cir. 1958); *see also Garcia*, 915 F. Supp. 2d at 835; *Patel v. Rice*, 403 F. Supp. 2d 560, 565 (N.D. Tex. 2005), *aff'd*, 224 F. App'x 414 (5th Cir. 2007).

**B. Applicable Law at the Time of Plaintiffs' Births**

In the current matter, the parties do not dispute that Iris and Jesus were born in Mexico, that their mother (Ana) is a United States citizen, and that their father was a citizen of Mexico at the time of their births. As a result, Plaintiffs' claims of acquired citizenship at birth are based on the provisions of the Immigration and Nationality Act (INA) that apply to children born in a foreign country, to one parent who at the time was a United States citizen and one parent who was an alien.

In 1997 and 2000, the year of Iris's and Jesus's respective births, the INA provided the same requirements for United States citizenship: Before each of Iris's and Jesus's births, their United States citizen mother must have been "physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years". 8 U.S.C. § 1401(g) (1994); 8 U.S.C. § 1401(g) (2000).

The physical presence requirement can be met through the cumulation of non-continuous periods of time within the United States. *See id.* ("period or periods"); *see also United States v. Garza-Flores*, No. 2:20-CR-00953, 2021 WL 5771866, at *6 (S.D. Tex. Dec. 5, 2021) ("An individual does not need to be physically present in the United States *continuously*."); *Fernandez Cardona v. Garland*, No. 7:19-CV-2, 2021 WL 3148868, at *4 (S.D. Tex. June 22, 2021), *report and recommendation adopted sub nom. Fernandez Cardona v. Barr*, No. 7:19-CV-002, 2021 WL 3144540 (S.D. Tex. July 26, 2021) ("Physical presence, however does not have to be continuous".).

Accordingly, Iris and Jesus must prove by a preponderance of the evidence that their mother (Ana) was physically present in the United States for a period or periods totaling five years

before their respective births, at least two years of which must have occurred after Ana turned 14 years of age.

### C. Ana's Physical Presence in the United States

#### 1. Ana's Childhood

Ana argues that she lived in Houston beginning shortly after birth. But the trial evidence does not support such a finding. Ana does not dispute that she was born in Mexico, and her uncles, Constancio and Juan, have no memory of Ana living in Houston before she attended grade school.

The evidence demonstrates, however, that beginning when Ana was about seven years old, she lived in Houston for at least two and a half years. Her uncle Juan confirmed that Ana attended Eliot Elementary School with his own children. Ana herself remembers these school years with her cousins. And both Juan and Ana testified about spending time together as an extended family in Houston when Ana was a young child. In addition, her other uncle, Constancio, similarly remembers living with Ana's family in Houston when she was a school-aged child.

Multiple witnesses also corroborated that Ana and her mother moved to Mexico after the discovery of her father's affair. Juan testified that this move occurred about two or three years after Ana first attended school with his sons. And Ana remembers that she was about 10 or 11 years old when she moved to Mexico. Considering the totality of the evidence, the Court finds that it is more likely than not that Ana lived in Houston for two and a half years before she turned 14 years old.

#### 2. Ana's Time Working in the United States

The trial record demonstrates that after Ana turned 14, she worked in the United States for at least three years.

Ana testified that she worked in the United States as a teenager and as an adult. First, when Ana was 16 to 18 years old, she worked in south Texas as a live-in babysitter for three months at a time, with one-week breaks in between each stint. At trial, she explained in detail her

motivation for seeking work and how she sought different babysitting jobs. She also described one of the families for whom she worked in detail. The Court finds her testimony credible.

In addition, Ana, Jose, and Yolanda all testified about Ana's time working as a live-in babysitter as a young adult, between about December 1994 through February 1996. The witnesses consistently described how Ana worked for a nurse during the week, slept at Yolanda's house on Fridays, and then spent Saturday and Sunday in Mexico visiting her mother.

Although the testimony does not permit a precise calculation of the time that Ana worked in the United States, it is sufficient for the Court to find that it is more likely than not that Ana worked in the United States for at least three years after she turned 14.

The government emphasizes that in Ana's deposition when she sought a declaration of citizenship, she omitted any information about her alleged work in the United States. That case, however, did not center on Ana's physical presence in the United States. She may have discounted the importance of providing all information about her work experience, or she may have hesitated to divulge the information because she used her sister's documents at times to enter the United States. While the discrepancy in Ana's testimony does raise some concerns, when viewed in the light of all the evidence, the Court finds her trial testimony credible.

### D. Application to Plaintiffs

Ana gave birth to Plaintiffs Iris and Jesus in 1997 and 2000, respectively. As previously explained, by February 1996, Ana had been physically present in the United States for at least two and a half years as a child, and for at least three years after she turned 14 years old. As a result, as to each plaintiff, the trial record demonstrates that Plaintiffs' mother was physically present in the United States for at least five years prior to each Plaintiff's birth, with no more than three of those years before she turned 14. These time periods satisfy the applicable standard for acquiring United States citizenship at birth.

## III. Conclusion

Based on the Court's findings of fact and the applicable law, it is:

**ORDERED** that Plaintiff Iris Ximena Palomo Diaz's request for a declaratory judgment under 8 U.S.C. § 1503(a) is **GRANTED**; and

**ORDERED** that Plaintiff Jesus Ulises Palomo Diaz's request for a declaratory judgment under 8 U.S.C. § 1503(a) is **GRANTED**.

The Court will separately issue a Final Declaratory Judgment in accordance with this Order and Opinion.

Signed on July 14, 2023.

Fernando Rodriguez, Jr.
Fernando Rodriguez, Jr.
United States District Judge